UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


DONALD W. SZYDLOWSKI, SR.,        )
                                 )
            Plaintiff,           )
                                 )
      vs.                        )      No. 4:05CV498-DJS
                                 )
PENSION BENEFIT GUARANTY         )
CORPORATION,                     )
                                 )
            Defendant.           )


<u>ORDER</u>


          Plaintiff Donald Szydlowski, a participant in the Trans
World Airlines, Inc. Retirement Plan for Employees ("the Plan"),
brings this action against defendant Pension Benefit Guaranty
Corporation ("PBGC"), the trustee and guarantor of the Plan.  The
complaint contains four claims, namely that PBGC: 1) failed to
provide Plan information within thirty days of plaintiff's request
pursuant to 29 U.S.C. § 1132(c); 2) breached its fiduciary duty to
plaintiff; 3) should be estopped from revoking a portion of
plaintiff's pension benefits and refusing to acknowledge the
legitimacy of an amended domestic relations order ("DRO"); and 4)
violated plaintiff's due process rights by denying plaintiff a
hearing in his administrative appeal of the PBGC's decisions.  Now
before the Court are cross-motions for summary judgment.  The Court
will enter judgment in favor of defendant PBGC and against
plaintiff on all counts because PBGC as the trustee of the Plan is

not subject to 29 U.S.C. § 1132(c); PBGC's potential fiduciary breaches have not harmed plaintiff; PBGC has not committed affirmative misconduct justifying estoppel; and due process does not require a hearing in plaintiff's administrative appeal.

## Background

The following facts have been established for purposes of the cross-motions for summary judgment. Trans World Airlines, Inc. ("TWA") established and maintained the Plan to provide benefits for certain of its employees. Effective January 1, 2001, the Plan was terminated by agreement between TWA, Pitchin Corporation (an affiliate of TWA established in 1993 to sponsor the Plan), and PBGC, pursuant to 29 U.S.C. § 1342, and PBGC was appointed as the Plan's statutory trustee on January 2, 2001, pursuant to 29 U.S.C. § 1342(c).

"In enacting Title IV [of the Employee Retirement Income Security Act ("ERISA")], Congress sought to ensure that employees and their beneficiaries would not be completely deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 637 (1990) (citation omitted). To this end, "Title IV of ERISA, which governs plans subject to termination, provides that PBGC, a wholly-owned government corporation, will insure certain benefits provided by all employer-sponsored defined benefit plans, so that employees

2

will receive them even when the plan itself does not have enough assets to cover its benefit liabilities." Pineiro v. Pension Benefit Guar. Corp., 318 F. Supp. 2d 67, 72 (S.D.N.Y. 2003) ("Pineiro IV"). As part of the PBGC's efforts, it may appoint itself trustee of a plan in termination. 29 U.S.C. § 1342(c); Pension Benefit Guar. Corp. v. Scherling, 905 F.2d 173, 175 (8th Cir. 1990).

PBGC has promulgated a regulation governing the administrative review procedures for agency determinations. 29 C.F.R. § 4003.7. Participants may appeal benefit determinations to the PBGC Appeals Board, a panel of officials appointed by the agency's Executive Director. 29 C.F.R. §§ 4003.1(a),(b)(6),(7), 4003.2, 4003.51. The Appeals Board's decision constitutes the agency's final action on the matter. 29 C.F.R. § 4003.59(b).

Soon after the Plan's termination, plaintiff applied to PBGC for a pension benefit retroactive to January 2001. A qualified domestic relations order ("QDRO") from 1995 relating to plaintiff and his ex-wife Denise Sullivan, the alternate payee under the QDRO,[1] provided Sullivan with a separate interest in 50% of plaintiff's benefit under the Plan and her share of plaintiff's subsidized early retirement benefits -- on the condition that

_____

[1] "The term 'alternate payee' means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K).

Sullivan begins to receive benefits under the Plan and plaintiff subsequently retires with subsidized early retirement benefits. The prior plan administrator, TWA, had determined that this order had met the requirements of 26 U.S.C. § 414(p) and 29 U.S.C. § 1056(d)(3) and, upon entry by the St. Louis County Circuit Court, it thus became a qualified domestic relations order (the "1995 QDRO").

PBGC estimated that plaintiff's monthly benefit amount was $839.23. Correspondingly, PBGC provided Sullivan with an estimated monthly benefit of $164.10. On August 17, 2001, PBGC sent written notification to plaintiff that PBGC would begin paying him his estimated benefit amount beginning on September 1, 2001. The letter stated that after PBGC completed its review, PBGC would send plaintiff a formal determination of his benefit. (Admin. R. [Doc. #26] at 12.)

On March 5, 2003, PBGC's actuarial contractor Buck Consultants, Inc., provided PBGC with a revised calculation of plaintiff's benefit. The revised calculation showed that plaintiff was due a monthly benefit of $558.14, and Sullivan a monthly benefit of $459.95.[2] On April 9, 2003, PBGC notified its Miami field benefit administration office that PBGC would defer making the adjustments to plaintiff's and Sullivan's benefit amounts until PBGC issued a formal benefit determination.

_____

[2] Plaintiff has not offered any argument that these are incorrect calculations.

4

On February 23, 2004, Sullivan, the alternate payee, died. PBGC did not issue any further monthly benefit payments to her after her death. (Admin. R. [Doc. #26] at 117-118.) On August 27, 2004, PBGC sent a formal determination letter (the "Original Determination Letter") to plaintiff stating that plaintiff was entitled to a benefit of $558.14 per month, which was to be actuarially reduced by $55.81 to $502.33 per month until the PBGC had recouped the monthly overpayments made to plaintiff since September 1, 2001, which totaled $13,211.23. The Original Determination Letter inaccurately stated that the alternate payee under the 1995 QDRO was the estate of Denise Sullivan.

On September 1, 2004, plaintiff sent PBGC a written appeal of PBGC's determination in its Original Determination Letter. Plaintiff's appeal stated that the correct alternate payee was Denise Sullivan, not her estate, and alleged that improper payments were made to the estate of the alternate payee. Plaintiff also alleged that the equitable doctrine of laches prevented PBGC from modifying the estimated benefit amount. Plaintiff requested an oral hearing of his appeal.

On September 10, 2004, PBGC responded to plaintiff's appeal by sending a letter to plaintiff explaining that:

> [the 1995 QDRO] does clearly state that the alternate payee is assigned, as her separate property, 50% of the benefit payable to the participant accrued as of August 30, 1987. This benefit is payable to the alternate payee for her lifetime. The alternate payee received her benefit from the plan until her death. Under the separate interest QDRO, the alternate payee's separate

property does not revert to the participant upon her
death.

(Admin. R. [Doc. #26] at 27.)

On September 16, 2004, PBGC sent plaintiff a supplemental
determination letter (the "Supplemental Determination Letter"),
confirming that the reduction in plaintiff's benefits was proper.
The Supplemental Determination Letter also noted that the correct
alternate payee, under the 1995 QDRO, was the decedent Ms.
Sullivan.  On September 22, 2004, plaintiff's counsel replied in a
letter to the PBGC Appeals Board stating that PBGC's Supplemental
Determination Letter did not address the issues in plaintiff's
written appeal of September 1, 2004.  On September 23, 2004,
plaintiff's counsel sent a written request to PBGC's Miami field
benefit administration office for release of a copy of the Plan
document and information regarding the administration of the Plan.
The request included an authorization from plaintiff.  On September
24, 2004, PBGC sent plaintiff an acknowledgment of his request for
written information.

On October 27, 2004, plaintiff obtained an amended
domestic relations order ("Amended DRO") from the St. Louis County
Circuit Court.  The Amended DRO was identical to the 1995 QDRO
except that the Amended DRO included a provision that called for a
reversion of the alternate payee's portion of plaintiff's benefit
in the event the alternate payee predeceased plaintiff.  On

November 4, 2004, plaintiff's counsel submitted the Amended DRO to PBGC.

On November 17, 2004, PBGC determined, and notified plaintiff by letter (the "Amended DRO Determination Letter"), that the Amended DRO was not qualified, and that PBGC will not qualify a separate interest order that provides that the alternate payee's benefit reverts to the participant if the alternate payee dies after commencing benefits. On November 22, 2004, plaintiff sent PBGC a written appeal of the Amended DRO Determination Letter stating that PBGC must obey the Amended DRO, and that PBGC had no authority to determine the validity of the Amended DRO. Plaintiff requested an oral hearing of the appeal.

On December 17, 2004, the PBGC Appeals Board sent plaintiff its Final Determination Letter affirming PBGC's determination of plaintiff's benefits as set forth in the Original Determination Letter, the Supplemental Determination Letter, and the Amended DRO Determination Letter. The Appeals Board held that: (1) PBGC was not estopped from changing plaintiff's estimated benefit amount; (2) PBGC made no improper payments to third parties; (3) PBGC properly determined that the Amended DRO was not qualified; and (4) the PBGC Appeals Board declined to provide plaintiff with an oral hearing. (Admin. R. [Doc. #26] at 90-97.)

On December 22, 2004, PBGC responded to plaintiff's September 22, 2004 written request for information regarding the Plan and sent plaintiff a copy of the Plan document along with a

copy of the contents of plaintiff's benefit file. All fees associated with plaintiff's request were waived.

On February 10, 2005, PBGC sent plaintiff a letter informing him that his benefit was being reduced to the correct amount of $558.14 per month pursuant to the Final Determination Letter, and actuarially reduced to $502.33 per month to account for the four years that plaintiff was incorrectly overpaid at $839.23 per month. (Admin. R. [Doc. #26] at 100.) The letter stated that the recoupment would stay in effect unless and until the overpayments were repaid. (Admin. R. [Doc. #26] at 100.) On February 10, 2005, PBGC notified the deceased alternate payee's heirs (her two sons) that PBGC would send to them lump-sum checks totaling $12,362.11 to correct the underpayments made to Ms. Sullivan while she was receiving estimated benefits. In making payment to the two sons, PBGC followed its operating policy regarding the correction of underpayments owed to a participant or beneficiary who has died.

## Discussion

### A. PBGC is not subject to disclosure requirements of ERISA Title I because it is not an administrator

In Count I, plaintiff asserts that PBGC violated the disclosure requirements of Title I of ERISA, which provides that:

> [a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested . . . within 30 days after such

> request may in the court's discretion be personally
> liable to such participant or beneficiary.

29 U.S.C. § 1132 (c)(1)(B). ERISA defines an administrator as "the person specifically so designated by the terms of the instrument under which the plan is operated," or, "if an administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A)(I), (ii).

As courts in several other circuits have held, PBGC is a statutory trustee of the Plan, not an administrator. *See* <u>Burstein v. Ret. Account Plan For Employees of Allegheny Health Educ. and Research Found.</u>, 334 F.3d 365, 369 n.3 (3d Cir. 2003) (pointing out that although PBGC, as the Statutory Trustee, takes over some of the Plan duties from the administrator upon termination of the plan, "Statutory Trustee is the term used when the Plan is a terminated plan . . . , whereas administrator is the term used when the plan is ongoing"); <u>Holl v. Pension Benefit Guar. Corp.</u>, No. 00-1365, 2000 WL 1118152, at *1 (7th Cir. 2000) (affirming a trial court determination that the PBGC is a trustee and not an administrator of terminated plans); <u>Boivin v. U.S. Airways, Inc.</u>, No. Civ.A. 03-2373(JR), 2005 WL 713622, at *2 (D.D.C. 2005) (recognizing that PBGC, "when it acts as statutory trustee of a terminated pension plan, . . . is not a plan 'administrator' or 'plan sponsor,' and the reporting and disclosure requirements of ERISA Title I are inapplicable"). While the Court recognizes that a trustee may have some fiduciary duties, the statutory language

9

makes clear that these disclosure requirements apply only to "the person designated under ERISA as the 'administrator' of the plan, not [to] every fiduciary." Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993). Therefore, the Court finds that the Title I disclosure requirements do not apply to PBGC and will enter judgment in favor of PBGC and against plaintiff on this count.

PBGC, as a government agency, is governed by the Freedom of Information Act ("FOIA") when complying with requests for agency records. 5 U.S.C. § 552; see also 29 C.F.R. § 4901. Although plaintiff has not raised the issue of an FOIA violation in his complaint, the Court will briefly address plaintiff's argument on that issue, made in response to PBGC's motion for summary judgment. PBGC must respond to an FOIA information request within twenty (20) working days under the FOIA and ten (10) working days according to PBGC policy. Compare 5 U.S.C. § 552(a)(6)(A)(I), with 29 C.F.R. § 4901.14(a). The PBGC then requires the requested records to be promptly made available to the requester. 29 C.F.R. § 4901.14(b). The FOIA places the burden on PBGC, not plaintiff, to sustain its action and directs district courts to "determine the matter de novo." 5 U.S.C. § 522(a)(4)(B). Although PBGC did respond within the ten (10) day period, the record production took over three (3) months. Despite the belated production of the documents, plaintiff has not shown how he was harmed by not having the documents before the PBGC Appeals Board denied his appeal. As discussed below, even

with the benefit of the requested records, plaintiff's arguments on the matters before this Court are unavailing.

**B.   PBGC's action as a trustee did not breach the fiduciary duty it owes plaintiff**

Plaintiff alleges two fiduciary breaches in Count II -- the making of improper disbursements to the beneficiaries of the alternate payee and a failure to timely correct miscalculations in plaintiff's estimated benefits.  Under Title I of ERISA, a person is a fiduciary with respect to a plan "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  A Title I fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  A fiduciary is charged with exercising "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Id. § 1104(a)(1)(B).

**1.   PBGC does owe plaintiff a fiduciary duty in making and issuing benefit determinations**

11

The parties cite to conflicting authority concerning whether PBGC owes plaintiff a fiduciary duty when it makes and issues benefit determinations. The relied-upon authorities disagree whether PBGC performs these determinations in its role as statutory trustee or statutory guarantor. Plaintiff cites to Pineiro IV, 318 F. Supp. 2d 67 (S.D.N.Y. 2003), for the proposition that "PBGC acts in its capacity as trustee when it issues benefit determinations and pays benefits . . . , and is therefore subject to fiduciary duties of care and loyalty in so doing." Id. at 103. PBGC cites to Caskey v. Pension Benefit Guar. Corp., No. 97-CV-4240, 1999 U.S. Dist. LEXIS 21448 (E.D. Pa. Jan. 14, 1999), which instructs that "When PBGC calculates entitlement to benefits under a plan it has absorbed, it acts as guarantor and administrator, not as trustee, and thus fiduciary responsibilities do not attach to those acts." Id. at *14. However, Caskey relies heavily on Pineiro v. Pension Benefit Guar. Corp., No. 96 Civ. 7392(LAP), 1997 WL 739581, at *10 (S.D.N.Y. Nov. 26, 1997) ("Pineiro I"), as the basis for its holding. Pieneiro I was subsequently questioned by the same court in Pineiro v. Pension Benefit Guar. Corp., No. 96 Civ. 7392(LAP), 1999 WL 195131, at *1-*2 (S.D.N.Y. Apr. 7, 1999), and vacated with respect to this holding in Pineiro v. Pension Benefit Guar. Corp., No. 96 Civ. 7392(LAP), 2000 WL 282894, at *3 (S.D.N.Y. Mar. 15, 2000). See Pineiro IV, 318 F. Supp. 2d at 76-77.

The Court having thoroughly reviewed the extensive opinion and order of Pineiro IV, which properly analyzes Title IV's language, structure, and legislative history, shares the court's finding "that Congress intended the trustee, not PBGC as guarantor, would have responsibility for reconstructing the plan's documents, as well as calculating and paying benefits." Pineiro IV, 318 F. Supp. 2d at 80. To this Court's knowledge, no other court has performed the same level of analysis on this issue as Pineiro IV, but some courts have implicitly and explicitly followed its reasoning. See Piech v. Pension Benefit Guar. Corp., 744 F.2d 156, 157 (D.C. Cir. 1984) ("[PBGC], as *trustee* of the company's three pension plans, determined that none of the plaintiffs was entitled to guaranteed benefits.") (emphasis added); Boivin v. US Airways, Inc., 297 F. Supp. 2d 110, 117 (D.D.C. 2003) (discussing Piech and Pineiro IV).

"A trustee has the same fiduciary duties of care and loyalty owed by fiduciaries of ongoing plans, as well as the specific duties of a Chapter 7 bankruptcy trustee, '[e]xcept to the extent inconsistent with the provisions of [Title IV].'" Pineiro IV, 318 F. Supp. 2d at 81 (quoting 29 U.S.C. § 1342(d)(3)). Only the trustee's mandatory actions can be inconsistent with the provisions of Title IV; these actions include: "preventing the plan's assets from [inuring] to the benefit of the employer, [29 U.S.C.] § 1103(c), avoiding increasing PBGC's liability, *id.* §

1342(d)(1)(A)(vi)," and allocating the assets of terminated plans in an order specified by 29 U.S.C. § 1344. Pineiro IV, 318 F. Supp. 2d at 81 (citations omitted); *see also* 29 U.S.C. § 1104(a)(1) ("Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . ."). The trustee's remaining duties are discretionary and thus are not inconsistent with the provisions of Title IV. Pineiro IV, 318 F. Supp. 2d at 81. Although PBGC's actions are to be judged by their reasonableness, the Court does apply some Chevron deference in reviewing the agency's actions. Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 652 (1990) ("This practical agency expertise is one of the principal justifications behind *Chevron* deference.") (referring to Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865 (1984)); Pineiro IV, 318 F. Supp. 2d at 91.

   **2.    PBGC disbursements to the alternate payee's beneficiaries did not breach its fiduciary duty**

       The Court now addresses the first alleged fiduciary breach -- the making of improper disbursements to the beneficiaries of the alternate payee. Benefit payments made by private pension plans covered by ERISA generally cannot be alienated or assigned. 29 U.S.C. § 1056(d). The anti-assignment rule applies to "the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic

14

relations order," unless "the order is determined to be a qualified domestic relations order." 29 U.S.C. § 1056(d)(3)(A). Rights and payments under a QDRO are exempt from preemption. 29 U.S.C. § 1144(b)(7).

There are two basic types of QDROs – "shared payment" and "separate interest." *See* <u>Samaroo v. Samaroo</u>, 193 F.3d 185, 188 n.2 (3d Cir. 1999). The two types of QDROs have been distinguished by a pair of commentators as follows. A shared payment QDRO typically assigns a fixed percentage of a participant's monthly benefit to the alternate payee, who is unable to receive benefits until the participant has gone into pay status. *See* Cynthia A. Samuel & Katherine S. Spaht, *Fixing What's Broke: Amending ERISA to Allow Community Property to Apply upon the Death of a Participant's Spouse*, 35 Fam. L.Q. 425, 441 (2001). A separate interest QDRO, on the other hand, divides the actual pension before the participant begins collecting benefits and allows both the participant and the alternate payee to each elect a form of benefits for their respective separate shares. <u>Id.</u> at 440-41; Gary A. Shulman, Qualified Domestic Relations Order Handbook 135, 148 (2d Ed. 1999) [Doc. #20-2].

> [U]nder the separate interest approach, there is no reversion of benefits to the participant if the alternate payee predeceases the participant after the alternate payee's benefit commencement date . . . because the alternate payee's benefits have been actuarially adjusted to his or her own lifetime. Upon the alternate payee's death, the benefits will permanently cease.

Id. at 135-36.

The 1995 QDRO grants the alternate payee benefits payable for the *lifetime* of the alternate payee. (1995 QDRO [Doc. #27-2] ¶3.) The alternate payee was "assigned, as her *separate* property, a portion of the coordinated benefits payable to the participant," thus indicating that Sullivan received a separate interest QDRO. (1995 QDRO [Doc. #27-2] ¶2 (emphasis added).) Sullivan's benefits under the separate interest QDRO ceased upon her death.

Plaintiff asserts that it was a fiduciary breach to pay the underpayment to Sullivan's estate. An alternate payee under a QDRO has beneficiary status under the plain language of ERISA. 29 U.S.C. § 1056(d)(3)(J); In re Nelson, 322 F.3d 541, 544 (8th Cir. 2003). "[T]he United States Supreme Court essentially recognized that Congress, via the QDRO provisions, intended that all persons conferred beneficiary status via a QDRO be given the same protections ERISA affords to plan participants." Id. at 545 (discussing Boggs v. Boggs, 520 U.S. 833, 854 (1997)). Sullivan, as the alternate payee, was owed the difference between the estimated monthly benefit payments and the actual monthly benefit entitlements set out in the formal benefit determination.

No monthly pension payments were made to Sullivan after her death. However, according to the formal benefit determination, Sullivan's estimated monthly benefit payments should have been larger during her lifetime. Therefore, PBGC appropriately paid her

estate $12,362.11 -- the amount owed to Sullivan.  Under a separate interest QDRO, the participant -- plaintiff -- does not have a right to any of the alternate payee's remaining potential benefits. PBGC informed plaintiff that the initial payments he was receiving was an *estimate*, and that he would receive a formal benefit determination at some future date after PBGC completed its review. (Admin R. [Doc. #26] at 98.)  PBGC's misestimation of the monthly benefit payments did not breach its fiduciary duty to either plaintiff or Sullivan.

Plaintiff cites to two inapposite district court cases in support of his argument that PBGC breached its fiduciary duties -- Kann v. Keystone Resources, 575 F. Supp. 1084 (W.D. Pa. 1983), and Freund v. Marshall & Ilsley Bank, 485 F. Supp. 629 (W.D. Wis. 1979).  In Kann, the court held that an employer of a participant in a pension plan could not avoid paying the participant on the basis that the employer should not have made the contributions to the plan at the outset.  Kann, 575 F. Supp. at 1091.  PBGC never refused to pay plaintiff and the source of plan funds is not at issue in this case.  In Freund, the court held that pension plan administrators breached fiduciary duties to participants by directing the majority of plan assets back to the sponsoring companies as loans.  Freund, 485 F. Supp. at 636.  Here again, these facts are not analogous to the case before this Court. Plaintiff's arguments do little other than to cite to two examples

17

where courts found that a fiduciary had breached its duty to a plan participant.

**3. No loss occurred when PBGC belatedly corrected miscalculations in plaintiff's estimated benefits**

With respect to the second alleged fiduciary breach -- PBGC's failure to timely correct miscalculations in plaintiff's estimated benefits, PBGC discovered the miscalculation of benefits in March 2003 and did not inform plaintiff of the overpayments until August 2004. PBGC asserts that it was unable to reduce plaintiff's estimated benefit immediately upon receiving revised calculations from the agency's actuarial consultant. The Court does recognize that PBGC performs an overwhelming amount of auditing and valuing and allocating plan assets. *See* Boivin, 2005 WL 713622, at *2. However, PBGC is still capable of promptly changing the estimated benefit payments, or at least of informing participants of significant upcoming changes. PBGC's asserted inability to institute changes to estimated benefit payments until the agency can issue a formal benefit determination is belied by the fact that Sullivan's benefits were terminated immediately upon her death, which also took place before plaintiff's formal benefit determination.

Despite PBGC's potential breach of a fiduciary duty, plaintiff cannot meet his burden of proof and establish that plaintiff suffered a loss or that PBGC knew that its failure to provide the information to plaintiff might cause harm. *See* 29

U.S.C. § 1109(a) (requiring that the fiduciary breach cause the loss asserted); In re Unisys Corp. Retiree Med. Benefit, 57 F.3d 1255, 1265 (3d Cir. 1995) (holding that "when a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information *when it knows that its failure to do so might cause harm*, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries") (emphasis added). Plaintiff was overpaid for three years and now only has to repay the excess payments in installments of ten percent of his current benefits and without interest. While plaintiff may have been unnecessarily misled as to the probable size of his pension payments upon a formal benefit determination, plaintiff was effectively loaned the overpayments for several years without interest. This Court does not find that plaintiff was harmed by PBGC's actions.

**C.    PBGC cannot be estopped as it has not committed an affirmative misconduct**

In Count III, plaintiff asserts that PBGC should be estopped from revoking a portion of plaintiff's pension benefits and refusing to acknowledge the legitimacy of the Amended DRO.

> To establish a claim of equitable estoppel against the government, the claimant must prove: 1) false representation by the government; 2) that the government had the intent to induce the plaintiff to act on the misrepresentation; 3) the plaintiff's lack of knowledge or inability to obtain the true facts; and 4) the plaintiff's reliance on the misrepresentation to his detriment.

<u>Rutten v. U.S.</u>, 299 F.3d 993, 995 (8th Cir. 2002). A party raising an equitable estoppel claim against the government must not only prove all the elements of equitable estoppel, but also that the government committed affirmative misconduct going beyond mere negligence. <u>Id.</u>; <u>Morgan v. C.I.R.</u>, 345 F.3d 563, 566 (8th Cir. 2003); <u>Charleston Hous. Auth. v. U.S. Dept. of Agric.</u>, 419 F.3d 729, 739 (8th Cir. 2005). "Affirmative misconduct" is defined as misconduct that is designed to mislead or is unmistakably likely to mislead a plaintiff. <u>Bell v. Fowler</u>, 99 F.3d 262, 268-69 (8th Cir. 1996). PBGC as a "wholly-owned Government corporation," 31 U.S.C. § 9101(3)(J), and an "Executive agency" of the United States, 5 U.S.C. §§ 103, 105, is considered the "government" for estoppel purposes. *See* <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 72 F. Supp. 2d 547, 559 (W.D. Pa. 1999).

As a matter of law, the Court does not find that the PBGC's actions constitute an affirmative misconduct. PBGC first informed plaintiff that he was receiving an *estimated* monthly benefit payment and later informed plaintiff of its formal benefit determination. PBGC has an inherent right to recoup benefit overpayments, as it has done in this case. *See* <u>U.S. v. Wurts</u>, 303 U.S. 414, 416 (1938)("The Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has 'clearly manifested its intention' to raise a statutory barrier."); *see also* <u>Bechtel v. Pension Benefit</u>

Guar. Corp., 781 F.2d 906, 907 (D.C. Cir. 1986). The right to correct the error causing overpayment naturally follows the right to recoup. *See* 29 C.F.R. § 4022.81(a).

At least one circuit has recognized a distinction between estopping a government agency acting in its "proprietary" as opposed to its "sovereign" role. *See* F.D.I.C. v. Harrison, 735 F.2d 408, 411 (11th Cir. 1984). According to Harrison, plaintiff need not prove affirmative misconduct if PBGC was acting in its proprietary capacity. Id. Assuming arguendo that PBGC acted in its proprietary capacity as a trustee in determining each participant's level of benefits, plaintiff still fails to meet the remaining elements of an equitable estoppel claim. PBGC did not make any misrepresentations to plaintiff and its actions did not harm plaintiff, as plaintiff was permitted to make use of the overpayments for several years and does not have to pay PBGC interest on the overpayments.

Plaintiff also asserts that PBGC should be estopped from rejecting the Amended DRO. The Amended DRO allows the alternate payee's benefit to revert to plaintiff if the alternate payee were to predecease him, whether or not the alternate payee had begun receiving benefits. The anti-assignment rule, as discussed above, does not exclude QDROs. 29 U.S.C. § 1056(d)(3)(A). However, to be qualified a DRO cannot "require the plan to provide increased benefits (determined on the basis of actuarial value)." 29 U.S.C.

§ 1056(d)(3)(D)(ii). The separate interest nature of the 1995 QDRO causes the Amended DRO to provide for increased benefits. Sullivan's benefit was calculated as a single-life annuity, with the monthly benefits separately adjusted to *her* lifetime. Under this type of QDRO, no reversion of benefits to the participant can occur if the alternate payee predeceases the participant when the alternate payee has already commenced receiving benefits. As discussed above, the alternate payee's benefits have been actuarially adjusted to her lifetime, leaving nothing to revert to plaintiff upon Sullivan's death. Requiring a reversionary interest inherently requires an increase in benefits when Sullivan was to have received her entire interest during her lifetime. Therefore, PBGC cannot and should not be required to recognize the Amended DRO as a QDRO.

Plaintiff does note that a QDRO can be modified or corrected posthumously, citing Hogan v. Raytheon Co., 302 F.3d 854, 857 (8th Cir. 2002). However, Hogan does not circumvent the statutory requirement that a QDRO not provide for increased benefits. Furthermore, unlike the facts before the court in Hogan, plaintiff seeks to change the property rights as they existed before the death of Sullivan, not recognize preexisting rights. *See* id. For these reasons, the Court will enter summary judgment in favor of PBGC and against plaintiff on Count III.

**D. Due process does not require a hearing in plaintiff's administrative appeal**

Count IV of plaintiff's complaint alleges that plaintiff has been deprived of due process because the PBGC Appeals Board refused to grant him an in-person hearing on his appeal. Due process does not necessarily require that an administrative agency afford an aggrieved party an opportunity to appear and present oral argument. McGraw Elec. Co. v. U.S., 120 F. Supp. 354, 358 (E.D.Mo. 1954) (citing F.C.C. v. WJR, The Goodwill Station, Inc., 337 U.S. 265, 275 (1949)). Pursuant to 29 C.F.R. § 4003.55(b), the PBGC Appeals Board permits a hearing for any aggrieved party who shows a dispute of material fact. Plaintiff asserts the following disputed material facts: "the propriety of Defendant's revocation of Plaintiff's benefits; the amount of benefits to which Plaintiff is entitled; the effect of the QDRO on Plaintiff's benefits; and the unlawfulness of Defendant's disbursement of Plan funds to the estate of the Alternate Payee." (Compl. [Doc. #1] at 5.) All of plaintiff's assertions are issues of law, not fact. Due process does not require PBGC to hold an in-person hearing when plaintiff cannot establish any disputed facts.

For all the above reasons, judgment will be entered in favor of PBGC and against plaintiff on all counts.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Szydlowski's motion for summary judgment [Doc. #15] is denied.

**IT IS FURTHER ORDERED** that defendant Pension Benefit Guaranty Corporation's motion for summary judgment [Doc. #18] is granted.

Dated this ___7th___ day of April, 2006.

                                        /s/Donald J. Stohr
                                        UNITED STATES DISTRICT JUDGE